**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

03/03/2026

LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

LINDA L. SPUNICH,
**By and through her Power of Attorney,**
**LISA BOYER,**

      **Plaintiff,**

**v.**                                    Civil Action No. <u>5:26cv00029</u>

**BUCK MARSH RUN AL, LLC,**
**d/b/a THE RETREAT AT BERRYVILLE, and**
**TWENTY/20 MANAGEMENT,**

      **Defendants.**

### COMPLAINT

Plaintiff Linda L. Spunich ("Mrs. Spunich"), by and through her Power of Attorney Lisa Boyer ("Mrs. Boyer"), sues Defendants and alleges as follows:

### I.    INTRODUCTION

1.    This case arises from a foreseeable and preventable resident-on-resident assault at an assisted living/memory care facility — The Retreat at Berryville — resulting in catastrophic injury to Mrs. Spunich. The Retreat's own records identify the assailant by name — "Sissel" — and document an escalating pattern of aggression by Sissel against Mrs. Spunich and other residents in the days leading up to the assault of Mrs. Spunich, a pattern that The Retreat recognized. Despite this notice, Defendants failed to implement basic, reasonable protections (such as, inter alia, supervision, separation, emergency escalation, transfer/discharge planning, and/or medical management through appropriate channels) to prevent a violent resident from injuring other vulnerable residents in The Retreat.

2.    On or about March 28, 2025, the resident "Sissel" knocked on Mrs. Spunich's door

and pushed her over when she opened it, causing her immediate right hip pain and inability to walk. The assault caused a displaced right femoral neck fracture requiring right hip hemiarthroplasty — a permanent prosthetic implant and permanent alteration of her anatomy and physiology — followed by skilled nursing/rehabilitation, significant functional decline, and a substantial risk of permanent impairment.

## II. JURISDICTION AND VENUE

3.  This Court has subject-matter jurisdiction under 28 U.S.C. Section 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this action is between citizens of different states.

4.  Mrs. Spunich is domiciled in West Virginia. Mrs. Boyer is domiciled in West Virginia and brings this action solely in a representative capacity for Mrs. Spunich.

5.  Defendant Buck Marsh Run AL, LLC ("Buck Run") is a Virginia limited liability company with its principal place of business in Mt. Pleasant, South Carolina.

6.  Upon information and belief, none of Defendants' members/owners are citizens of West Virginia, and complete diversity exists.

7.  Defendant Twenty/20 Management is a Virginia limited liability company with its principal place of business in Blacksburg, Virginia.

8.  Venue is proper in this District under 28 U.S.C. Section 1391(b) because a substantial part of the events and omissions giving rise to the claim occurred at The Retreat at Berryville in Berryville, Virginia, within the Harrisonburg Division.

## III. PARTIES

9.  Plaintiff Linda L. Spunich was briefly a resident of The Retreat at Berryville.

10. Plaintiff sues through her duly authorized Power of Attorney, Lisa Boyer, who is

2

Mrs. Spunich's POA.

11.     Defendant Buck Marsh Run AL, LLC owned, operated, and/or is responsible for The Retreat at Berryville, including for resident safety, staffing, supervision, and policies/procedures.

12.     Defendant Twenty/20 Management managed and/or controlled the facility's operations, policies, training, staffing, and resident safety system.

13.     At all relevant times, Defendants acted through employees, agents, apparent agents, and/or contractors, all acting within the scope of their duties and for whose acts and omissions Defendants are vicariously liable.

14.     Twenty/20 Management holds itself out publicly as a "best-in-class operator in senior housing" whose stated mission is to "improve residents' lives through world-class lifestyle offerings and compassionate care." Twenty/20 further represents that it provides "dementia care programming for residents no matter their age, acuity or activity level" and takes "a supportive approach for families as we cater to the assistance needed with activities of daily living (ADLs) and dementia care programming." Twenty/20 additionally represents that it will "show the highest integrity in all we do" and "uphold commitments to all residents, employees, and stakeholders."

15.     These representations were directed at families of prospective residents — including memory care residents like Mrs. Spunich and her family — and reflect Twenty/20's own acknowledgment that it assumed specific operational responsibilities for dementia care programming, resident safety, staffing, training, and supervision at the communities it manages, including The Retreat at Berryville.

16.     Consistent with these representations, Defendants publicly advertised The Retreat at Berryville as a facility whose "team is prepared for residents who wander day or night, present

elopement risks, or display combative or other behavioral issues."

17.    Residents displaying combative or aggressive behavior were therefore not an unforeseen or exceptional circumstance at The Retreat — they were the specific population Defendants held themselves out as specially trained and equipped to serve.

18.    Both Defendants bear responsibility for the systemic failures that allowed a known violent resident to injure Mrs. Spunich. Buck Run, as the facility owner and licensee, held the non-delegable duty to ensure resident safety, adequate staffing, appropriate supervision, and compliance with state-mandated standards of care. Twenty/20 Management, as the entity contracted to manage day-to-day operations, assumed and exercised control over the facility's policies, staffing patterns, training, dementia-care programming, and behavioral-risk management, and in fact attempted to control Sissel yet did so negligently. The deficiencies that led to this assault — including failures in and insufficient supervision, monitoring, separation of residents, escalation of behavioral concerns, and implementation of reasonable protective interventions — were the product of Defendants shared operational responsibilities and joint control of the environment in which the assault occurred. Each Defendant's acts and omissions created and perpetuated the unsafe conditions that allowed a foreseeable assault by a known aggressive resident, rendering both entities independently and jointly liable.

## IV. MRS. SPUNICH & HER TIME AT THE RETREAT AT BERRYVILLE

19.    The Retreat at Berryville is an assisted living and memory care facility that undertook duties to provide a reasonably safe environment and reasonable supervision, including protection from foreseeable resident-on-resident violence.

20.    Mrs. Spunich was an elderly, vulnerable resident with a history of dementia and was a known high fall-risk resident at the facility.

21.    Defendants' employees and agents knew that Mrs. Spunich had serious cognitive impairment due to dementia, that Mrs. Spunich was unable to recognize danger or protect her own safety and welfare, and that Mrs. Spunich was mentally incapable of self-preservation.

22.    Defendants' employees and agents knew that Mrs. Spunich needed supervision assistance from staff, that Mrs. Spunich needed assistance from staff to remain safe during periods of mobility, and that Mrs. Spunich needed staff to perform hourly checks for her safety.

23.    Another resident of the facility was identified in Mrs. Spunich's medical records by Defendants as "Sissel."

24.    Mrs. Spunich's records show escalating aggressive conduct by Sissel over the course of nine days.

25.    On information and belief, Sissel was not at the Retreat (an assisted living and memory care facility) voluntarily, and was in full time custodial care of the Retreat and Defendants.

26.    On March 26, 2025, Kendra (an administrator at the Retreat) called Lisa Boyer and told her that Mrs. Spunich, who had been quietly knitting in her room, had been "choked by a resident" who entered her room.

27.    That resident was Sissel.

28.    On March 27, 2025, bruises appeared on Mrs. Spunich's left arm.

29.    As Kendra looked at the bruises, Dana (an aide at the Retreat), said that Sissel had also "gone after" the person that evaluated him for a medication change.

30.    At approximately 12:30 p.m. on March 28, 2025, Mrs. Boyer went to The Retreat and spoke with Kendra about the choking incident.

31.    In an effort to confirm that The Retreat would protect her mother and control Sissel, Mrs. Boyer specifically asked what The Retreat was going to do to prevent further abuse.

32.    Kendra told Mrs. Boyer that Sissel's medication had been changed.

33.    At 5:49 p.m. that same day, an employee of The Retreat called Mrs. Boyer and informed her that Mrs. Spunich had been shoved backwards by Sissel when she opened her bedroom door.

34.    When asked how this could have happened and why Sissel was not being watched, The Retreat's employee Kendra stated, "That is a good question. It should have never happened," or words to similar effect.

35.    The Retreat's employee Jennifer further told Mrs. Boyer that two memory care patients had been the first to help Mrs. Spunich and that these patients protected Mrs. Spunich from further harm at the hands of Sissel.

36.     Mrs. Boyer asked Jennifer how this could have happened when Sissel had choked Mrs. Spunich two days earlier, why Sissel was not being watched, and why Sissel was able to get to Mrs. Spunich again.

37.    Jennifer stated that she did not know that Mrs. Spunich had been choked by Sissel two days earlier.

38.    Jennifer could not explain why Sissel was not being watched after the earlier choking incident.

39.    Jennifer said the aide provided by The Retreat was scared to help because she was afraid of Sissel.

40.    Mrs. Boyer asked about Sissel's change in medication that The Retreat had informed her about to reassure her of Mrs. Spunich's safety, and Jennifer admitted that the orders for the med change had "just came in" so Sissel did not have any new meds in him.

41.    Mrs. Boyer asked where Sissel was, and Jennifer said his wife had to sit with him or hire someone to do so until he was discharged.

42.    Sissel's abuse and misconduct had been well documented by the Retreat.

43.    A note by Michelle Kelley RDC in Mrs. Spunich's records reports five separate instances of resident Sissel exhibiting aggressive conduct residents, all within ten days before the incident in which Sissel harmed Mrs. Spunich. Specifically, the note states:

Sissel: Kathy and I completed a new ISP, a fall risk assessment, and added the psychiatric doctor's notes. Sissel was admitted on 3/13/2025, but no ISP was completed initially.

. . .

3/19: Two instances of aggressive behavior.

3/21: Grabbed another resident.

3/24: Grabbed another resident.

3/26: Had an altercation with another resident.

3/28: Pushed a resident, causing harm.

On 3/27, the psychiatric doctor assessed Sissel, noting he was calm and recommended Depakote, which his wife refused. Sissel is on Seroquel 50 mg twice a day, but the incoming order is stated once a day. No new order was found.

44.    Based upon the note alone, Defendants were aware of Sissel's troubled recent history, predisposition, disturbing interaction with other patients, noncompliance with psychiatric medication recommendations, and need for mood-stabilizing medication or other intervention.

45.    Furthermore, Defendants knew that Sissel's aggression had been specifically directed at Mrs. Spunich.

46.    Despite knowing all of this and possessing repeated documented notice that Sissel posed a danger to other residents, Defendants failed to implement reasonable protective measures, including but not limited to heightened supervision, separation, restriction of access to vulnerable residents, emergency escalation through medical channels, transfer to a higher level of care, and/or discharge/removal consistent with resident safety obligations.

47.    Mrs. Spunich was ultimately harmed by these failures on March 28, when she was violently pushed over by Sissel.

48.    Mrs. Spunich suffered immediate right hip pain and inability to ambulate and was transported by ambulance for emergency evaluation.

49.    Mrs. Spunich was diagnosed with a displaced right femoral neck fracture (right hip fracture).

50.    She was admitted to the hospital on March 28, 2025, and remained hospitalized through April 3, 2025.

51.    On March 29, 2025, Mrs. Spunich underwent right hip hemiarthroplasty under general anesthesia for a displaced right femoral neck fracture. The surgery included implantation of a prosthetic hip component system, with estimated blood loss of approximately 100 mL and no drains placed.

52.    At baseline before the assault, Mrs. Spunich ambulated independently within the facility without an assistive device. After the fracture and surgery, she experienced profound functional decline, requiring substantial assistance with bed mobility and transfers and only short-distance assisted ambulation during the acute hospitalization.

53.     Because she could not safely return to her baseline setting, Mrs. Spunich was discharged to skilled nursing/rehabilitation for post-acute care.

54.     A right hip hemiarthroplasty constitutes permanent implantation of prosthetic components and permanent alteration of anatomy and physiology.

55.     Mrs. Spunich has therefore sustained permanent physical injury.

56.     In addition, given her age, dementia, and the severity of a displaced hip fracture requiring hemiarthroplasty, she faces a substantial risk of permanent impairment, including persistent gait limitation, need for an assistive device, reduced ambulatory endurance, chronic pain, increased fall risk, and increased dependence for activities of daily living.

## COUNT I: NEGLIGENCE (INCLUDING VICARIOUS LIABILITY) & FAILURE TO PROTECT

57.     Plaintiff incorporates by reference the allegations above as if fully set forth herein.

58.     Defendants had a special relationship with Mrs. Spunich, given that, inter alia, the Retreat undertook the daily care of Mrs. Spunich, and that Defendants knew Mrs. Spunich had serious cognitive impairment due her dementia, that Mrs. Spunich was unable to recognize danger or protect her own safety and welfare, and that Mrs. Spunich was mentally incapable of self-preservation.

59.     Defendants' employees and agents knew that Mrs. Spunich needed supervision assistance from staff, that Mrs. Spunich needed assistance from staff to remain safe during periods of mobility, and that Mrs. Spunich needed staff to perform hourly checks for her safety.

60.     Defendants knew that Sissel represented a particular risk to the health and safety of Mrs. Spunich.

61.     Defendants owed Mrs. Spunich a duty of reasonable care to provide a reasonably safe resident environment and to protect her from foreseeable harm, including foreseeable harm

from other residents when Defendants had notice of violent tendencies.

62.     Twenty/20 Management's own public representations confirm its operational control over and independent duty of care to residents at The Retreat. Twenty/20 publicly undertook to provide "world-class" community operations, "dementia care programming for residents no matter their age, acuity or activity level," and "compassionate care."

63.     These representations are directed squarely at the dementia and memory care population that included both Mrs. Spunich and Sissel.

64.     Twenty/20 further advertised The Retreat as prepared to manage residents displaying "combative or other behavioral issues."

65.     Twenty/20's assumption of these operational responsibilities gave rise to — and Twenty/20 independently and separately owed — a duty of reasonable care to residents at The Retreat, including Mrs. Spunich.

66.     Mrs. Spunich was especially and particularly vulnerable given her physical, mental, and cognitive condition, of which Defendants were aware.

67.     Given the knowledge available to Defendants at the time — including the fact that Sissel had repeatedly engaged in aggressive behavior, grabbed residents, and had an altercation with a resident — Defendants knew that an assault by Sissel was reasonably foreseeable but negligently undertook to, and wholly failed to, otherwise protect residents by limiting Sissel's access to other residents, or through medical or psychiatric care to Sissel.

68.     Defendants breached their duties, including but not limited to:

a.     (1) Failing to protect residents from Sissel despite documented escalating aggression and violence toward residents in the days preceding the injury event;

b.     (2) Failing to implement appropriate enhanced supervision, separation, monitoring,

10

and/or restricted access after documented incidents of aggression;

c. (3) Failing to timely complete and implement appropriate behavioral risk planning and resident safety planning for a resident with known escalating aggression;

d. (4) Failing to appropriately escalate dangerous behavioral risk through medical channels and/or ensure effective intervention where psychiatric medication was recommended and medication ordering/administration was inconsistent or incomplete, while residents remained at risk;

e. (5) Failing to transfer, discharge, or remove Sissel from circumstances where he could harm other residents after repeated aggressive events and clear danger to others;

f. (6) Failing to provide adequate staffing and training sufficient to prevent and respond to resident-on-resident violence in a memory care/assisted living environment; and (

g. 7) Failing to protect Mrs. Spunich from foreseeable harm, resulting in a shove-and-fall injury causing hip fracture and the damages described herein.

69. Defendants are vicariously liable for the acts and omissions of their employees, agents, and/or apparent agents acting within the scope of their duties.

70. As a direct and proximate result of Defendants' negligence, Mrs. Spunich suffered severe injuries including a displaced right femoral neck fracture requiring right hip hemiarthroplasty, hospitalization, skilled nursing/rehabilitation, pain and suffering, loss of function, permanent injury, and a substantial risk of permanent impairment and future care needs.

71. Further, as a direct and proximate result of Defendants' negligence, the injuries to Mrs. Spunich carry a profoundly elevated risk of accelerated mortality, with medical literature

demonstrating that hip fractures in elderly patients with cognitive impairment are associated with one-year mortality rates exceeding 40%.

72.    The fracture further diminished her already-limited mobility, independence, and quality of life, and subjected her to the pain and trauma of surgical intervention and recovery that her compromised cognitive state left her unable to fully understand or participate in.

73.    Defendants' conduct demonstrated reckless disregard for resident safety, supporting an award of punitive damages to the extent permitted by Virginia law.

74.    Plaintiff seeks all compensatory damages proximately caused by Defendants' negligence.

75.    Defendants' conduct warrants an award of punitive damages under Virginia law because their actions were undertaken in conscious disregard of Mrs. Spunich's rights and with reckless indifference to the consequences.

76.    The gap between Twenty/20's public representations and its actual conduct underscore the willful and wanton nature of its negligence. Twenty/20 publicly committed to "the highest integrity in all we do" and to "uphold commitments to all residents."

77.    It advertised The Retreat as prepared to handle residents displaying "combative or other behavioral issues" and held itself out as providing "dementia care programming for residents no matter their age, acuity or activity level."

78.    Sissel was precisely the resident Twenty/20 advertised expertise in managing: a dementia patient with known, escalating, documented behavioral dysregulation.

79.    The five incidents of aggression in nine days were not an unexpected edge case; they were the foreseeable manifestation of the very population Defendants used to market itself to families like Mrs. Spunich's.

80.    Defendants' failure to act was not the product of an unforeseen circumstance but a conscious abandonment of the specific operational commitments it publicly undertook and upon which residents and their families reasonably relied.

81.    Defendants had actual knowledge of existing circumstances and conditions demonstrating that Sissel posed an imminent danger to other residents, specifically documented in their own records showing repeated incidents of escalating violent and aggressive behavior, culminating in an entry stating Sissel "pushed [Mrs. Spunich], causing harm" on March 28, 2025.

82.    From their knowledge of these existing circumstances and conditions — including Sissel's repeated physical aggression, and no ISP — Defendants were aware that their failure to implement protective measures would probably cause injury to Mrs. Spunich.

83.    Despite this awareness, Defendants consciously chose not to implement readily available protective measures, including enhanced supervision, physical separation, restricted access to vulnerable residents' living areas, timely psychiatric escalation, or transfer to a higher level of care.

84.    Defendants' conscious decision to take no meaningful protective action in the face of known, escalating, and documented violence against vulnerable, cognitively impaired residents constitutes willful and wanton negligence undertaken in conscious disregard of Mrs. Spunich's rights and with reckless indifference to the probable consequences.

85.    An award of punitive damages is appropriate to punish Defendants' willful and wanton conduct and to deter similar conduct in the future.

## COUNT II: NEGLIGENCE (INCLUDING VICARIOUS LIABILITY) & FAILURE TO CONTROL

86.    Plaintiff incorporates by reference the allegations above as if fully set forth herein.

87.    There is a duty to control the conduct of a third person as to prevent him from

causing physical harm to another when a special relation exists between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct.

88.    Specifically, one who takes charge of a third person, whom he knows or should know to be likely to cause bodily harm to others if not controlled, is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

89.    Defendants had undertaken more than an ordinary doctor-patient relationship with Sissel.

90.    Twenty/20's own representations reinforce the depth and nature of its custodial relationship with Sissel and its duty to control his conduct.

91.    By publicly undertaking "dementia care programming for residents no matter their age, acuity or activity level," advertising the facility as prepared to manage residents displaying "combative or other behavioral issues," and holding itself out as responsible for daily operations, staffing, training, and care management, Defendants acknowledged that its relationship with memory care residents like Sissel was not that of a passive landlord or arms-length service provider, but an active operational custodian with specific expertise in — and express responsibility for — managing the behavioral risks inherent in the dementia population it served.

92.    Defendants were indeed acting as the day-to-day custodians of Sissel.

93.    Defendants accepted Sissel as a resident through a formal admission process, including expressly undertaking responsibility for his daily care, supervision, and management.

94.    Sissel was not free to leave, he was in full-time custodial care, dependent entirely on Defendants for housing, meals, hygiene, medication administration, and daily activities.

95.    Sissel resided at the Retreat, and his movements were physically controlled and restricted by Defendants.

96.    Defendants controlled and had control over Sissel's physical environment, including where he slept, ate, and moved within the facility.

97.    Defendants were responsible for administering Sissel's psychiatric medications — which he was not capable of administering himself — including Seroquel, giving Defendants direct control over his behavioral management.

98.    Defendants controlled Sissel's access to his treating psychiatrist and the frequency of behavioral health evaluations.

99.    Unlike a physician in an outpatient setting who sees a patient and has no ongoing supervisory authority, Defendants had 24-hour, 7-day custody of Sissel — a qualitatively different and far more intensive relationship that gave them both the ability and the duty to control his conduct.

100.    On information and belief, Sissel suffered from dementia or other significant cognitive impairment that rendered him incapable of voluntarily choosing to reside at The Retreat — a memory care facility that, by its very nature, serves residents who lack the cognitive capacity to make independent living decisions.

101.    On information and belief, Sissel lacked the mental capacity to consent to or refuse his placement at The Retreat, meaning his residence was not the product of a voluntary, autonomous decision.

102.    The Retreat's records, on information and belief, reflect that Sissel was admitted by a family member, guardian, or authorized representative — not by Sissel himself — confirming that his placement was directed by others, not freely chosen.

103.    Defendants' records reflect that Sissel's wife, not Sissel, refused Sissel's recommended psychiatric medication, confirming that decision-making authority over Sissel had

been transferred to a third party, consistent with a resident who lacked capacity to direct his own care.

104.    Defendants had thus taken charge of Sissel, and a special relationship existed between Defendants and Sissel.

105.    Defendants also knew or should have known that Sissel posed a risk of bodily harm to Mrs. Spunich and other residents if left uncontrolled.

106.    Defendants' internal records document five separate incidents of aggressive and violent behavior by Sissel toward other residents in the days between his admission on March 13, 2025, and the assault on Mrs. Spunich on March 28, 2025.

107.    The pattern documented in Defendants' records reflects not an isolated incident but a sustained, escalating trajectory of physical aggression that any reasonable care provider would recognize as predictive of serious harm.

108.    On information and belief, Defendants conducted a pre-admission or admission assessment of Sissel that would have revealed his history of aggressive or violent behavior, his psychiatric diagnoses, and his current medications, all of which are standard components of memory care admission screening.

109.    On information and belief, information provided on Sissel's admission to a memory care facility on psychiatric medications placed Defendants on notice that Sissel had a known history of behavioral dysregulation requiring pharmaceutical management.

110.    On March 27, 2025, the day before the final assault on Mrs. Spunich, Defendants' own records reflect that a psychiatric assessment occurred, where it was recommended Sissel take Depakote to address his behavioral symptoms.

111.    The fact that a psychiatrist was consulted and recommended an additional mood-

stabilizing agent confirms that Defendants and their medical staff recognized Sissel's psychiatric condition was not adequately controlled and that he posed an ongoing behavioral risk.

112.    On information and belief, Sissel suffered from dementia or a related neurocognitive disorder, conditions well-recognized as carrying significant risk of agitation, aggression, and physical violence toward others — particularly in institutional settings.

113.    Defendants cannot claim ignorance of risks that are fundamental to the population they are licensed and paid to serve.

114.    The five documented incidents over nine days reflect a clear and accelerating pattern — two incidents on March 19, followed by physical grabbing on March 21 and again on March 24, followed by a physical altercation on March 26 — that any reasonable care provider would recognize as an escalating trajectory toward serious physical harm.

115.    Each successive incident provided Defendants with renewed and stronger notice that Sissel's aggression was worsening, not abating, and that absent intervention, serious injury to another resident would occur.

116.    Despite that Defendants undertook control of Sissel and knew that he posed a risk of bodily injury to residents in an assisted living facility, Defendants failed to reasonably control Sissel.

117.    Defendants failed to restrict Sissel's physical access to other residents' rooms, common areas, and living spaces despite documented repeated physical aggression toward other residents.

118.    Defendants failed to assign enhanced supervision to Sissel following the documented incidents of March 19, 21, 24, and 26, 2025.

119.    Defendants failed to physically separate Sissel from vulnerable residents, including

17

Mrs. Spunich.

120.    Defendants failed to relocate Sissel to a more secure area of the facility or a separate wing where his access to other residents could be controlled and monitored.

121.    Defendants failed to implement any meaningful behavioral intervention, de-escalation protocol, or structured supervision plan at any point during the days between Sissel's admission and the final assault on Mrs. Spunich.

122.    Defendants failed to ensure that Sissel's existing psychiatric medication was administered consistently and at the prescribed dosage and frequency, despite their direct control over and responsibility for medication administration.

123.    Defendants failed to discharge or remove Sissel from the facility in a timely manner after it became apparent that his continued presence posed an unacceptable risk of serious harm to other residents.

124.    Defendants failed to monitor Sissel's location and movements on March 28, 2025, allowing him to approach and enter the area of Mrs. Spunich's room unsupervised and unimpeded.

125.    Each of the foregoing failures, individually and collectively, constitutes a breach of Defendants' duty to exercise reasonable care to control Sissel and prevent him from causing bodily harm to Mrs. Spunich and other residents.

126.    Defendants' failure to control Sissel as each incident occurred reflects either willful blindness to an obvious and escalating danger or conscious disregard of the risk Sissel posed to other residents.

127.    Pursuant to the foregoing, Defendants are liable for the tortious conduct of Sissel.

128.    Defendants are liable for the actions and omissions of their employees, agents, and/or apparent agents acting within the scope of their duties.

129.    As a direct and proximate result of Defendants' negligence, Mrs. Spunich suffered severe injuries including a displaced right femoral neck fracture requiring right hip hemiarthroplasty, hospitalization, skilled nursing/rehabilitation, pain and suffering, loss of function, permanent injury, and a substantial risk of permanent impairment and future care needs.

130.    Further, as a direct and proximate result of Defendants' negligence, the injuries to Mrs. Spunich carry a profoundly elevated risk of accelerated mortality, with medical literature demonstrating that hip fractures in elderly patients with cognitive impairment are associated with one-year mortality rates exceeding 40%. The fracture further diminished her already-limited mobility, independence, and quality of life, and subjected her to the pain and trauma of surgical intervention and recovery that her compromised cognitive state left her unable to fully understand or participate in.

131.    Defendants' conduct demonstrated reckless disregard for resident safety, supporting an award of punitive damages to the extent permitted by Virginia law.

132.    Plaintiff seeks all compensatory damages proximately caused by Defendants' negligence.

133.    Defendants' conduct warrants an award of punitive damages under Virginia law because their actions were undertaken in conscious disregard of Mrs. Spunich's rights and with reckless indifference to the consequences.

134.    Defendants had actual knowledge of existing circumstances and conditions demonstrating that Sissel posed an imminent danger to other residents, specifically documented in their own records showing repeated incidents of escalating violent and aggressive behavior, culminating in an entry stating Sissel "pushed [Mrs. Spunich], causing harm" on March 28, 2025.

135.    From their knowledge of these existing circumstances and conditions — including

Sissel's repeated physical aggression, and no ISP — Defendants were aware that their failure to control Sissel would probably cause injury to Mrs. Spunich and other residents.

136.    Despite this awareness, Defendants consciously chose not to exercise reasonable control over Sissel.

137.    Defendants' conscious decision constitutes willful and wanton negligence undertaken in conscious disregard of Mrs. Spunich's rights and with reckless indifference to the probable consequences.

138.    Defendants conscious disregard is further evidenced by the stark contrast between their public representations and its conduct.

139.    For example, Twenty/20 advertised The Retreat as equipped to handle residents displaying "combative or other behavioral issues" and committed to "the highest integrity in all we do" and to "uphold commitments to all residents."

140.    Having held itself out as specially equipped and trained to manage the precise risk Sissel presented, Twenty/20's failure to implement any meaningful control, supervision, or behavioral intervention in the face of five documented escalating incidents of violence constitutes willful and wanton conduct warranting punitive damages.

141.    An award of punitive damages is appropriate to punish Defendants' willful and wanton conduct and to deter similar conduct in the future.

**COUNT III: VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(Va. Code § 59.1-196 et seq.)**

142.    Plaintiff incorporates by reference the allegations above as if fully set forth herein.

*The Consumer Transaction*

143.    On or about January 28, 2025, Mrs. Boyer, acting as Mrs. Spunich's authorized representative, entered into a "Twenty/20 Management Residency Agreement" (the "Residency

Agreement") with Buck Marsh Run AL, LLC — identified in the agreement as "Twenty/20 Management" — for Mrs. Spunich's admission to The Retreat at Berryville's memory care unit at a monthly rate of $6,980.

144.    The Residency Agreement constitutes a "consumer transaction" within the meaning of Va. Code § 59.1-198, as it involved the sale of services — specifically, assisted living and memory care services — for personal, family, or household purposes.

145.    Defendants are "suppliers" within the meaning of Va. Code § 59.1-198 and were engaged in the business of providing assisted living and memory care services to consumers.

### *The Representations*

146.    In connection with this consumer transaction, Defendants made numerous specific representations regarding the nature, quality, and scope of the services they would provide to Mrs. Spunich, including but not limited to the following:

147.    Prior to the transaction, Twenty/20 Management publicly represented itself as a "best-in-class operator in senior housing" whose mission is to "improve residents' lives through world-class lifestyle offerings and compassionate care."

148.    Twenty/20 further represented that it provides "dementia care programming for residents no matter their age, acuity or activity level" and takes "a supportive approach for families as we cater to the assistance needed with activities of daily living (ADLs) and dementia care programming."

149.    Twenty/20 represented that it would "show the highest integrity in all we do" and "uphold commitments to all residents, employees, and stakeholders."

150.    Defendants publicly advertised The Retreat at Berryville as a facility whose "team is prepared for residents who wander day or night, present elopement risks, or display combative

or other behavioral issues."

151.    In the Residency Agreement itself and related admission documents executed on January 28, 2025, Defendants represented that:

(a) The Retreat at Berryville had assessed Mrs. Spunich and determined that it "can meet [her] current needs for assisted living" (Schedule I, Part 7);

(b) Twenty/20 Management would "staff the Campus at all times" (Section I.A.7);

(c) Mrs. Spunich would be "free from mental, emotional, physical, sexual, and economic abuse or exploitation" and that her "known needs are not neglected or ignored by personnel of the facility" (Schedule E, Part 2.A.10);

(d) The facility had assessed whether it could meet Mrs. Spunich's needs, including by "equipping staff with specialized training, providing a higher level of supervision, offering psychosocial activities, or providing a type of physical environment that will enhance protection" (Mental Health Screening Determination Form, Part 3);

(e) Staff would "perform 1 hour checks for safety" for Mrs. Spunich (Individualized Service Plan); and

(f) Mrs. Spunich would "remain safe during periods of mobility" with supervision of staff (Individualized Service Plan).

152.    Upon being confronted by Mrs. Boyer about Mrs. Spunich's first episode of being attacked by Sissel, the Defendants represented that Sissel's medication had been changed.

153.    These representations were directed at and relied upon by Mrs. Boyer in deciding to place Mrs. Spunich at The Retreat at Berryville, in keeping Mrs. Spunich at The Retreat in Berryville, and in agreeing to pay $6,980 of Mrs. Spunich's funds per month for memory care services.

### *The Deception*

154.    Defendants' representations were deceptive, misleading, and false in that Defendants failed to deliver the services and protections they represented they would provide, including but not limited to:

(a) Defendants failed to provide a safe environment free from physical abuse, as Mrs. Spunich was assaulted by a fellow resident whose documented, escalating pattern of violence was known to Defendants;

(b) Defendants failed to equip staff with adequate training, provide a higher level of supervision, or provide a physical environment that enhanced protection, despite having certified at admission that they assessed and could meet these needs;

(c) Defendants failed to use the contractual authority they reserved to themselves — including the right to immediately terminate a resident who is "physically or verbally abusive to other residents" (Section IV.B.4) and the right to relocate a resident "as required for the health, safety or well-being of… other Twenty/20 Management residents" (Section II.C) — to protect Mrs. Spunich from a resident with five documented incidents of escalating violence in nine days;

(d) Defendants represented that they were "prepared for residents who… display combative or other behavioral issues" while simultaneously disclaiming "any responsibility to Resident for any injury, losses, damages or costs arising from… any action of any third party" (Section V.B), a provision that, if given effect, would negate the very capability Defendants used to induce families to entrust their loved ones to The Retreat's care;

(e) Defendants failed to implement the "dementia care programming" and "world-class" care they marketed, as evidenced by their admission of Sissel on March 13, 2025, without

completing any Individualized Service Plan, and their failure to implement any meaningful

behavioral intervention despite five documented incidents of aggression in nine days; and

(f) Defendants had not actually changed Sissel's medications at the time Defendants

reassured Mrs. Boyer that the change in medications would prevent further instances of

violence by Sissel.

### *VCPA Violations*

155.    Defendants' conduct constitutes violations of the Virginia Consumer Protection

Act, Va. Code § 59.1-200, including but not limited to:

(a) Misrepresenting the characteristics, benefits, and quantities of services, in violation of

§ 59.1-200(5);

(b) Misrepresenting the standard, quality, and grade of services, in violation of § 59.1-

200(6); and

(c) Using deception, fraud, false pretense, false promise, and misrepresentation in

connection with a consumer transaction, in violation of § 59.1-200(14).

### *Reliance and Causation*

156.    Mrs. Boyer — as Ms. Spunich's representative — relied on Defendants' pre-

transaction marketing representations and at-transaction written assurances in deciding, as her

power of attorney, to place Mrs. Spunich at The Retreat at Berryville and in paying $6,980 per

month for memory care services.

157.    This payment of funds was made with Mrs. Spunich's funds, by Mrs. Boyer as her

personal representative.

158.    Had Defendants disclosed their actual practices — including their failure to

implement behavioral management protocols for aggressive residents, their failure to complete

Individualized Service Plans for new admissions, their contractual disclaimer of responsibility for the conduct of the very residents they marketed expertise in managing, and the failure to actually change Sissel's medications — Mrs. Spunich would not have been placed at The Retreat and would not have remained at The Retreat after the first instance of violence at the hands of Sissel.

159.    As a direct and proximate result of Defendants' violations of the VCPA, Mrs. Spunich suffered severe injuries including a displaced right femoral neck fracture requiring right hip hemiarthroplasty, hospitalization, skilled nursing/rehabilitation, pain and suffering, loss of function, permanent injury, a substantial risk of permanent impairment and future care needs, and a profoundly elevated risk of accelerated mortality.

### Willfulness and Treble Damages

160.    Defendants' violations were willful within the meaning of Va. Code § 59.1-204 in that Defendants knowingly made the representations described above, knew or should have known that they were not delivering the services and protections represented, and continued to accept payment of $6,980 per month while failing to provide the represented level of care.

161.    Defendants' willfulness is further evidenced by the stark contrast between their specific, detailed public representations of capability — including expertise in managing residents displaying "combative or other behavioral issues" — and their complete failure to implement any protective measures during nine days of documented, escalating violence by Sissel against other residents, including Mrs. Spunich.

162.    Plaintiff is entitled to treble damages or $1,000, whichever is greater, under Va. Code § 59.1-204(A).

163.    Plaintiff is entitled to reasonable attorney's fees and court costs under Va. Code

§ 59.1-204(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants, jointly and severally, and asks

the Court to award:

A.    Past and future medical expenses (ambulance transport, emergency care, imaging,

hospitalization, surgery, medications, and follow-up care);

B.    Rehabilitation and skilled nursing costs, including post-acute placement;

C.    Past and future pain and suffering;

D.    Mental anguish and emotional distress;

E.    Loss of mobility, functional independence, and enjoyment of life;

F.    Permanent injury (prosthetic implant and anatomical alteration) and substantial risk

of permanent impairment;

G.    Punitive damages as permitted by Virginia law;

H.    Treble damages under the Virginia Consumer Protection Act, Va. Code § 59.1-

204(A);

I.    Reasonable attorney's fees and court costs under the Virginia Consumer Protection

Act, Va. Code § 59.1-204(B);

J.    Pre-judgment and post-judgment interest;

K.    Costs of suit; and

L.    Such other relief as the Court deems just and proper.


**Plaintiff demands trial by jury on all issues so triable.**

Respectfully submitted,


*/s/ Shawn H. Hogbin*
Shawn H. Hogbin, Esquire
Va. Bar No. 101080
SKINNER LAW FIRM
P.O. Box 487
Charles Town, West Virginia 25414
304-725-7029
Fax: 304-725-4082
hogbin@skinnerfirm.com