CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
October 02, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| Linda L. Spunich<br>*By and through her Power of Attorney, Lisa Boyer,*<br><br>Plaintiff,<br><br>v.<br><br>Buck Marsh Run AL, LLC<br><br>and<br><br>Twenty/20 Management,<br><br>Defendants. | Civil Action No. 5:26-cv-00029 |

**MEMORANDUM OPINION**

Plaintiff Linda Spunich brings suit against Defendants Buck Marsh Run AL, LLC ("Buck Run") and Twenty/20 Management ("Twenty/20") (collectively, "Defendants"), alleging several state law tort and statutory claims under diversity jurisdiction. Spunich, who was formerly a resident at the Defendants' assisted living facility, The Retreat at Berryville, suffers from dementia and presented a known fall risk. Her power of attorney, Lisa Boyer, placed Spunich in the Defendants' care based on their representations that they were equipped to handle residents with memory care needs and combative residents with behavioral issues. Nonetheless, the Defendants admitted another resident, Sissel, and then failed to prevent him from first choking and later shoving Spunich. As a result of Sissel's assault, Spunich suffered serious injury to her hip, requiring implantation of a prosthesis. Spunich, through Boyer, now sues the Defendants on two counts of negligence and one count of violating the Virginia

Consumer Protection Act. This matter is before the court on the Defendants' motion to dismiss under Rule 12(b)(6). (Dkt. 12.) For the reasons stated below, the court will grant the motion in part and deny in part.

## I. Background[1]

Spunich was a resident at the Retreat at Berryville ("the Facility"), an "assisted living and memory care facility." (Complaint ¶¶ 9, 19 (Dkt. 1).) She suffers from "serious cognitive impairment due to dementia" and presented a "high fall risk." (*Id.* ¶¶ 20, 21.) Buck Marsh Run AL, LLC ("Buck Run") owns and licenses the Facility, and Twenty/20 Management ("Twenty/20") manages its day-to-day operations, including controlling "the [F]acility's policies, staffing patterns, training, dementia-care programming, and behavioral-risk management." (*Id.* ¶ 18.)

Sissel was another resident "in full time custodial care of the [Facility]," (*id.* ¶ 25), who engaged in a pattern of "escalating aggressive conduct" against Spunich and other residents at the Facility, including choking Spunich on March 26, 2025, (*id.* ¶¶ 24, 26–27, 43–44). Following the choking incident, Lisa Boyer ("Boyer") acting as Spunich's power of attorney and authorized representative, spoke with "Kendra," an administrator at the Facility, and asked what preventative actions they planned to take about Sissel's behavior. (*Id.* ¶¶ 26, 30–31.) Kendra informed Boyer that "Sissel's medication had been changed." (*Id.* ¶ 32.) On March 28, 2025, just five hours after Boyer spoke with Kendra about the choking incident, Sissel "shoved [Spunich] backwards . . . when she opened her bedroom door," causing Spunich to

[1] The facts are taken from Spunich's complaint and, at this stage, are presumed to be true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

suffer a right hip fracture requiring hospitalization and implantation of a "prosthetic hip component system." (*Id.* ¶¶ 33, 49–51.) Other memory care patients, rather than the Defendants' employees, were the first to help Spunich and prevented Sissel from further harming her. (*Id.* ¶ 35.)

According to the Facility's records, Sissel was admitted into the Facility on March 13, 2025, but no Individualized Service Plan ("ISP") was initially created for him. (*Id.* ¶ 43; Defs.' Br. at 11 (Dkt. 13).) Records showed Sissel had engaged in five instances of aggressive conduct towards residents at the Facility before March 28, 2025, when he shoved and injured Spunich. (Compl. ¶ 43.) The Defendants' records showed that Sissel had grabbed other residents on multiple occasions. (*Id.* ¶ 43). The records also reflected that the psychiatric doctor assessed Sissel and recommended Depakote on March 27, 2025, the day before he shoved Spunich, but his wife refused the recommendation. (*Id.*)

Despite their knowledge of Sissel's prior aggressive behavior, the Defendants did little to prevent him from causing further harm. (Compl. ¶¶ 23–32.) Specifically, the Defendants failed to "implement appropriate enhanced supervision" or restrict Sissel's access to other residents; "complete and implement appropriate behavioral risk planning" taking into account Sissel's pattern of aggressive behavior; "ensure effective intervention where psychiatric medication was recommended"; "transfer, discharge, or remove Sissel" when they had contractual freedom to do so; or provide staff adequately trained to respond to inter-resident violence. (*Id.* ¶¶ 67–68; 154.) Sissel was not restricted from accessing Spunich's room after choking her on March 26. (*Id.* ¶¶ 33–38.) Additionally, because the Defendants had not yet

received the order for Sissel's new medication, "Sissel did not have any new meds in him" when he pushed Spunich over. (*Id.* ¶ 40.)

In March 2026, Spunich, represented via power of attorney by Boyer, sued the Defendants for negligence (Counts I and II) and violation of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-196 et seq. (Count III). (Dkt. 1.) Spunich requests compensation for past and future medical, rehabilitation, and nursing costs; emotional distress; loss of mobility and permanent injury; pre- and post- judgment interest; attorney's fees and costs of suit; and treble and punitive damages under Virginia law. (*Id.* at 26.) The Defendants filed a partial motion to dismiss, seeking dismissal of Count III (the VCPA claim) and the request for punitive damages as relief for Counts I and II (the negligence claims). (*see* Defs.' Br.)

## II. Standard of Review

Motions to dismiss for failure to state a claim brought under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When

reviewing a Rule 12(b)(6) motion to dismiss, the court must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the [p]laintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). But the court does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (cleaned up).

## III. Analysis

### A. Counts I and II: Punitive Damages Claims

Spunich presents two theories of negligence against the Defendants. First, Spunich alleges that there was a special relationship between herself and the Defendants and that the Defendants failed to protect her from foreseeable harm perpetrated by Sissel. (Dkt. 1 ¶¶ 57–85.) Next, Spunich alleges the Defendants were negligent in failing to control Sissel. (*Id.* ¶¶ 86–141.) In addition to compensatory damages, Spunich seeks punitive damages for these negligence claims because the Defendants' conduct was "willful and wanton," as well as "undertaken in conscious disregard of . . . Spunich's rights and with reckless indifference to the probable consequences." (*Id.* ¶¶ 84, 137.)

Because this case is brought pursuant to diversity jurisdiction, Virginia law will apply. (*Id.* ¶¶ 3–8.) "A federal court resolving a diversity action is, absent a controlling constitutional provision or act of Congress, obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules." *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). "Virginia

applies the *lex loci delicti*, the law of the place of the wrong, to tort actions. . . ." *Milton v. IIT Rsch. Inst.*, 138 F.3d 519, 521 (4th Cir. 1998); *McMillan v. McMillan*, 253 S.E.2d 662, 663 (1979) (affirming *lex loci delicti* as the settled rule in Virginia). "Thus, Virginia's choice of law rule selects the law of the state in which the wrongful act took place, wherever the effects of that act are felt." *Milton*, 138 F.3d at 522. In this case, alleged negligence took place in Virginia. (*See* Compl. ¶ 8.) Thus, the court will apply Virginia law.

Virginia recognizes three levels of negligence: (1) simple negligence, (2) gross negligence, and (3) willful and wanton negligence. *Doe by & Through Doe v. Baker*, 857 S.E.2d 573, 587 (Va. 2021); *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918–19 (Va. 2004). Simple negligence is defined as "the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another." *Cowan*, 603 S.E.2d at 918. Gross negligence "show[s] indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Id.* Gross negligence "would shock fair-minded persons, although [it] demonstrate[es] something less than willful recklessness." *Id.*

What distinguishes willful and wanton negligence from gross negligence is that "actual or constructive consciousness of the danger involved is an essential ingredient" of willful and wanton negligence. *Boward v. Leftwich*, 89 S.E.2d 32, 35 (Va. 1955). While simple and gross "[n]egligence convey[] the idea of heedlessness, inattention, [and] inadvertence," willful and wanton negligence "convey[s] the idea of purpose or design, actual or constructive." *Id.* Thus, a defendant cannot be liable for willful and wanton negligence unless the harm was sufficiently

likely and the defendant was aware of the harm's likelihood, such that the harm suffered can be deemed the defendant's "purpose or design." *Id.* "Willful and wanton negligence is action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Alfonso v. Robinson*, 514 S.E.2d 615, 618 (Va. 1999).

Nonetheless, "[i]ll will is not a necessary element" of willful and wanton negligence. *Infant C. v. Boy Scouts of Am., Inc.*, 391 S.E.2d 322, 327 (Va. 1990) (quoting *Friedman v. Jordan,* 184 S.E. 186, 187 (Va. 1936)); *see also Friedman,* 184 S.E. at 187 ("The absence of actual malice does not defeat the right to recover [punitive] damages."). Rather, it is enough that the defendant acts "consciously in disregard of another person's rights," or "with reckless indifference to the [known, probable] consequences." *Riddick v. Watson*, 503 F. Supp. 3d 399, 425 (E.D. Va. 2020) (quoting *Cowan*, 603 S.E.2d at 919).

Further, the award of punitive damages is disfavored under Virginia law. They should be awarded "only in cases involving the most egregious conduct." *Horn v. Webb*, 882 S.E.2d 894, 901 (Va. 2023) (quoting *Bowers v. Westvaco Corp.*, 419 S.E.2d 661, 668 (Va. 1992)). Unless there is "fraud, malice, oppression, or other special motives of aggravation, . . . compensatory damages only are permissible." *Id.* (quoting *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 479 (Va. 2019)).

Under Virginia law, only willful and wanton negligence, rather than simple or gross negligence, warrants the imposition of punitive damages. *Id.* Though Spunich pleads that the

Defendants' conduct was "willful and wanton," (*id.* ¶¶ 84, 137), the court need not defer to the Plaintiff's conclusions of law. *Edwards*, 178 F.3d at 244. Spunich sufficiently alleges that the Defendants knew that Sissel had the capacity to cause harm and failed to prevent him from doing so. (Compl. ¶¶ 23–47; Pl.'s Br. at 4–6 (Dkt. 16).) But she does not plausibly allege that it was the Defendants' "purpose or design" to cause harm by failing to properly restrain Sissel. *Boward*, 89 S.E.2d at 35. Nor does she allege any action or inaction by the Defendants that is so egregious that it goes "beyond that which shocks fair-minded people." *Harris v. Harman*, 486 S.E.2d 99, 102 (Va. 1997).

Allegations of the Defendants' delay, (Compl. ¶¶ 32, 34–35, 38, 40), staffing incompetence, (*id.* ¶¶ 34–39), and knowledge of Sissel's prior acts, (*id.* ¶¶ 26–29, 42–45), are insufficient to show that the Defendants engaged in willful and wanton negligence. While these allegations may demonstrate the "heedlessness, inattention, [and] inadvertence" of simple or gross negligence, *Boward*, 89 S.E.2d at 35, they do not evoke "fraud, malice, oppression, or other special motives of aggravation," *Horn*, 882 S.E.2d at 901 (citations omitted). As alleged, the Defendants' omissions may constitute "utter disregard of prudence that amounts to a complete neglect" of Spunich's safety, but they do not rise to the level of "conscious[] . . . disregard" of her rights. *Riddick*, 503 F. Supp. 3d at 425.

To meet the high bar of alleging the Defendants consciously disregarded Spunich's safety, Spunich must plead that the Defendants' "actual or constructive consciousness of the danger involved" leads to the conclusion that the Defendants' "purpose or design" was to cause the harm suffered. *See Boward*, 89 S.E.2d at 35. Facts similar to and more extreme than

those Spunich alleged have been deemed insufficient to rise to the level of willful or wanton negligence. For example, in *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, the Virginia Supreme Court found insufficient allegations of willful and wanton conduct when the plaintiff pled that the employer-defendants knew that an assailant-employee faced allegations of child sexual abuse yet took no action and continued to allow the assailant access to children, culminating in the assault of A.H. 831 S.E.2d at 465–67, 479. Similarly, in *Egan v. Ream*, the Virginia Court of Appeals found the plaintiffs had alleged gross negligence, but not willful and wanton negligence, when they claimed that the plaintiff, a high school student with down syndrome, was sexually assaulted by another student after the two had been left alone by the defendant-teachers despite the assailant's prior criminal charge for sexual assault and the school's knowledge that the assailant was "a moderate risk for committing sexual re-offense." No. 1022-24-3, 2025 WL 2445508, at *1–2, 4 (Va. Ct. App. Aug. 26, 2025), *appeal docketed* (May 6, 2026). Even viewing the alleged facts in the light most favorable to Spunich, *see Edwards*, 178 F. 3d at 244, conclusory allegations that the Defendants' "conscious decision[s] constitute[] willful and wanton negligence," do not suffice to state a claim for punitive damages, (*see, e.g.*, Compl. ¶ 137.).

**B. Count III: Virginia Consumer Protection Act Claim**

In addition to her two negligence claims, Spunich alleges the Defendants violated the VCPA. Va. Code § 59.1-196 et seq. The purpose of the VCPA is "to promote fair and ethical standards of dealings between suppliers and the consuming public." *Id.* § 59.1-197. With several exclusions, *see id.* § 59.1-199, the Act prohibits various "fraudulent acts . . . committed

by a supplier in connection with a consumer transaction." *Id.* § 59.1-200. Specifically, Spunich alleges that the Defendants violated the Act by

> (a) Misrepresenting the characteristics, benefits, and quantities of services, in violation of § 59.1-200(5);
>
> (b) Misrepresenting the standard, quality, and grade of services, in violation of § 59.1-200(6); and
>
> (c) Using deception, fraud, false pretense, false promise, and misrepresentation in connection with a consumer transaction, in violation of § 59.1-200(14).

(Compl. ¶ 155); Va Code Ann. § 59.1-200.

Spunich alleges that her representative,[2] Boyer, relied on marketing representations and written assurances by the Defendants in deciding to place Spunich in the Defendants' care. (Compl. ¶¶ 155–59.) Spunich alleges that, among other representations, Boyer relied upon Twenty/20's public representation of its skill in caring for dementia patients, (*id.* ¶ 148); the Defendants' advertisement of the Facility as employing a team "prepared for residents who . . . display combative or other behavioral issues," (*id.* ¶ 150); and resident admissions documents which promised that Spunich would be "free from . . . physical . . . abuse or exploitation," because the Facility had taken measures such as "equipping staff with specialized training [and] providing a higher level of supervision," (*id.* ¶ 151).

Spunich also claims that Boyer relied on continued assurances made by the Defendants in keeping her at the Facility after she was choked by Sissel. (*Id.* ¶ 153). After Sissel's first attack on Spunich, the Defendants warranted "that Sissel's medication had been changed" to

[2] Spunich makes claims involving Boyer's reliance because, as her power of attorney, Boyer was making the chronicled decisions on Spunich's behalf. (*See* Compl. ¶¶153, 156–7.)

prevent further harm. (*Id.* ¶¶ 31–32, 152). But due to delays in receipt of the order for Sissel's new medication, "Sissel did not have any new meds in him" when he pushed Spunich over. (*Id.* ¶ 40.)

The Defendants move to dismiss these claims on the grounds that they are outside the Act's prohibitions. Virginia Code § 59.1-199 excludes from the VCPA's mandate "[a]ny aspect of a consumer transaction which . . . is authorized under laws or regulations of the Commonwealth or the United States, or the formal advisory opinions of any regulatory body or official of the Commonwealth or the United States." VA Code Ann. § 59.1-199; (Defs.' Br. at 4.) The Defendants argue that comprehensive regulation of assisted living facilities by the Virginia General Assembly and the Virginia Department of Social Services ("VDSS") "authoriz[es]" the aspects of this consumer transaction that are at issue—specifically, "staffing commitments, hourly safety checks, individualized service plans, and freedom from abuse." (Defs.' Br. at 4–5 (citing Va. Code Ann. § 59.1-199).)

The applicability of the VCPA to assisted living facilities was first addressed in *Beaty v. Manor Care, Inc*, No. 02-1720-A, 2003 WL 24902409, at *4, *4 n.1 (E.D. Va. Feb. 10, 2003). The defendants in *Beaty* made a nearly identical argument—they argued that providing assisted living services "is a highly regulated industry," and they identified several regulations that applied to the elements of the facility which the plaintiffs alleged were deficient. *Id.* at *4–5. Nonetheless, the court held that the claims against the assisted living facility were not exempted from the VCPA because the regulations cited by the defendant "[did] not regulate the type of misrepresentations alleged by [the p]laintiffs." *Id.* at *5. Specifically, "[w]hile those

statutes regulate the assisted living facility, they do not cover misrepresentations made regarding those aspects of the facility." *Id.* When the plaintiffs allege that misrepresentations with respect to the quality of a service induced them to enter a contract, "the type of statute that would exempt [the p]laintiffs' claims from the VCPA would be one which regulated advertising and sales." *Id.*

Thus, the nature of Spunich's claims dictates what type of regulation would create an exemption under VCPA § 59.1-199. If Spunich argued under the VCPA that the quality of care provided was, itself, deficient—rather than that there was deception about the quality of care provided—"such a claim likely would be exempted from the statute because the Virginia code addresses the degree of care that must be provided by adult-care facilities to their residents." *Id.* at *5 n.2 (citing *Brogdon v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1336–37 (N.D. Ga. 2000) (finding the plaintiffs' claims of deficient care by a long-term care facility were not cognizable under the Georgia Fair Business Practices Act of 1975, a statute parallel to the VCPA). Accordingly, the quality of care provided by assisted living facilities is "authorized under laws or regulations of the Commonwealth." Va. Code Ann. § 59.1-199.

The Defendants argue that "[t]he specific representations [the] Plaintiff identifies in the Complaint as the basis for her VCPA claim—including staffing commitments, hourly safety checks, individualized service plans, and freedom from abuse—are not merely marketing claims," but rather, relate to quality requirements imposed via regulation. (Defs.' Br. at 5.) They stress that the content of the alleged misrepresentations, which includes staffing sufficiency, 24-hour supervision, individualized service planning, behavioral management,

medication administration, and resident-abuse prevention, is covered, and thus authorized, by quality-defining regulations. *See* Va. Code Ann. § 59.1-199; (Defs.' Br. at 4–9.)

But it is not the content of the misrepresentations that controls. Rather, it is the fact of the misrepresentations themselves. As in *Beaty*, "[Spunich] do[es] not bring this Count on the grounds that the supervision at [the Facility] was deficient, but rather on the basis of misrepresentations made regarding the degree of supervision." *Beaty*, 2003 WL 24902409 at *5. Naturally, Spunich must allege the deficiencies themselves to prove that such representations by the Defendants *were* misrepresentations. *See Caruth v. Clark,* No. 1:16-cv-149, 2017 WL 1363314, at *3 (E.D. Va. Apr. 12, 2017) (explaining that a "VCPA claim necessarily depends on the underlying fraud claim"). In her negligence claims, Spunich argues that the quality of care provided was, itself, deficient. However, in Count III, Spunich references defects in the quality of care provided only to allege that "Mrs. Boyer . . . relied on [the] Defendants' pre-transaction marketing representations and at-transaction written assurances" in placing Spunich at the Facility and in keeping her there. (Compl. ¶¶ 156–59.) Thus, the Defendants must identify statutes or regulations which cover advertising or sales of assisted living services to escape the ambit of the VCPA. *See Beaty,* 2003 WL 24902409, at *5.; *Caruth*, 2017 WL 1363314, at *5 ("[T]he authorizing statute need not, of course, authorize misrepresentations—but it must at least address communications by [the Defendants] to [the Plaintiffs] in order to have an exclusionary effect in this case.").

The Defendants produce no such regulation. Instead, they point to Virginia regulations governing the provision of a safe environment, Va. Code Ann. § 63.2-1732(A); staffing,

training, and supervision practices, *id.* §§ 63.2-1732(B), (C); 22 Va. Admin. Code § 40-73; discharge and transfer obligations with respect to dangerous residents, 22 Va. Admin. Code §§ 40-73-310, 430; the provision of individualized service plans and staff qualifications, Va. Code Ann. § 63.2-1732; 22 Va. Admin. Code § 40-73-450; and medication administration and management, Va. Code Ann. § 63.2-1732(C); 22 Va. Admin. Code §§ 40-73-450, 640, 690. (*See* Defs.' Br. at 5–8). None of these laws or regulations concern the advertisement or sale of assisted living services.

In *Beaty*, the defendants relied on Va. Code Ann. § 63.1–175(D) to claim that the misrepresentations at issue were regulated by Virginia law.[3] This provision required that "[n]o facility shall advertise or market a level of care which it is not licensed to provide."[4] The court held that even this regulation, which directly addressed a type of deceit in advertising, was not sufficiently tailored to the conduct the plaintiffs alleged to "authorize" the relevant "aspect of

---

[3] Va. Code Ann. § 63.1–175(D) has since been repealed and replaced with Va. Code Ann. §§ 63.2-1701 and 63.2-1800. Va. Code Ann. § 63.2-1800 includes identical language to the original advertising prohibitions found in § 63.1–175(D). *See* Va. Code Ann. § 63.2-1800 ("No facility shall advertise or market a level of care that it is not licensed to provide. Nothing in this subsection shall prohibit the facility from describing services available in the facility."); *Beaty*, 2003 WL 24902409, at *5.

[4] The Defendants make much of the *Beaty* court's distinction between advertising care that was not provided and advertising care that the Defendants were not licensed to provide. (Defs.' Br. at 5–6.) The Defendants are correct that the *Beaty* court deemed the plaintiffs' allegations within the scope of the VCPA because Va. Code Ann. § 63.1–175(D) only prohibited advertising care that the facility was not licensed to provide. *See Beaty*, 2003 WL 24902409, at *5. Thus, the *Beaty* plaintiffs' allegations that the defendants falsely advertised care they *were* licensed to provide were not excluded from the VCPA's mandate. *Id.* But the Defendants are wrong to rely on this distinction, as the same circumstances arise in this case. Va. Code Ann. § 63.2-1800 prohibits "advertis[ing] or market[ing] a level of care [which the Facility] is not licensed to provide." Here, "[Spunich is] not alleging that the [F]acility advertised a level of care it was not *licensed* to provide, but rather that it advertised care it did not provide." *Beaty*, 2003 WL 24902409, at *5 (emphasis in original). The *Beaty* plaintiffs' "VCPA theory targeted advertising promises not specifically regulated," in the same way that Spunich's VCPA theory does. (*See* Defs.' Br. at 6.) *Compare Beaty*, 2003 WL 24902409, at *2 (describing the misrepresentations at issue, including representations that the facility staff was "specially trained and educated to deal with Alzheimer's patients," that the facility would provide "24-hour supervision," that the facility had "high staffing ratios," and that the facility was "safe") *with* (Compl. ¶¶ 146–153 (alleging misrepresentations, including that the Facility was "prepared for residents who . . . display combative or other behavioral issues," that Twenty/20 would "staff the Campus at all times" and staff would "perform 1 hour checks for safety," and that Spunich would be "free from . . . physical . . .abuse" at the Defendants' "best-in-class" senior housing).)

[the] consumer transaction" and exclude the plaintiffs' claims from the VCPA. *See Beaty*, 2003 WL 24902409, at *4, 5. Similarly, this prohibition on the Defendants' advertising of care which the Facility is "not licensed to provide" does not address false advertising regarding services that the Facility was licensed to provide. *See* Va. Code § 63.2-1800. As a result, the court finds that the Plaintiff's misrepresentation claims do not fall within the VCPA exclusions under § 59.1-199.

## IV. Conclusion

For these reasons, the court will **GRANT** in part and **DENY** in part the Defendants' motion to dismiss Spunich's complaint. (Dkt. 12.) The motion to dismiss Spunich's claims for punitive damages under Counts I and II will be **GRANTED**, and those claims will be **DISMISSED without prejudice.** The court will **GRANT** Spunich leave to file an amended complaint within 21 days of the date of the Order that accompanies this Memorandum Opinion. The Defendants' motion to dismiss Count III will be **DENIED**.

An appropriate Order will issue.

**ENTERED** this 2nd day of October, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE